## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DONETTA HILL,** | : | |
| **Petitioner,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **No. 12-2185** |
| | : | |
| **JOHN E. WETZEL et al.,** | : | |
| **Respondents.** | : | |

**McHUGH, J.**                                                      **November 10, 2016**

### <u>MEMORANDUM</u>

Petitioner Donetta Hill is a prisoner seeking federal habeas relief from two state convictions of murder.  Ms. Hill maintains her innocence and alleges that various constitutional errors occurred before and during her trial.  Though most of these allegations lack merit, Ms. Hill has raised two potentially meritorious claims of ineffective assistance of counsel:  (1) that her trial attorney failed to reasonably investigate Ms. Hill's social history, and thus failed to learn of her various and severe cognitive impairments; and (2) that counsel failed to reasonably investigate the circumstances of her allegedly coerced confessions, and thus failed to learn that the detective who questioned her had a substantial history of improper interrogation.  Because these claims might  – if substantiated – entitle Ms. Hill to habeas relief, I will grant her request for an evidentiary hearing.  If Ms. Hill can show that competent counsel would have uncovered information in these investigations sufficient to raise a reasonable probability of acquittal, she must be retried.

Accordingly, for the reasons that follow I will **GRANT** Petitioner's request for an **EVIDENTIARY HEARING** on Claims 5 and 9, **DENY** Petitioner's remaining claims, and **GRANT** a Certificate of Appealability on all claims.

1

## I.      Background

In June 1990, seventy-two-year-old Nghia Quy Lu was found robbed and beaten to death with the claw-end of a hammer in his South Philadelphia home. Police investigated the crime, but arrested no initial suspects. In April 1991, Nairobi Dupont was also found robbed and beaten to death with a hammer in his home, which was a mere three-and-a-half blocks from the scene of the Lu crime. Police conducted a canvass of the area, during which they spoke to several homeless people and cocaine addicts staying nearby. When asked who might have committed the Dupont murder, these individuals mentioned another local homeless addict, Petitioner Donetta Hill.

Ms. Hill, who suffers from "pervasive" cognitive impairment, borderline intelligence, bipolar disorder, and PTSD, *Decl. of Dr. Jethro Toomer at* 3, ECF 10-2 at 82, was well-known to area police at the time of the investigation. She had grown up and attended school in the neighborhood, and she had multiple psychiatric and psychological referrals from the departments of human services and child protective services. At the time of the investigation, Ms. Hill still often stayed at her mother's home. She had recently given birth to her second child and had returned to the neighborhood after serving a prison sentence for robbery.

After the police canvass, Ms. Hill heard from other homeless addicts that the police wished to speak with her. Accordingly, she went to talk to her probation officer, Maurisio Delisi. Accompanied by Mr. Delisi and another probation employee, Ms. Hill reported to the homicide division of the Philadelphia Police Department. There, she was taken to an interrogation room and questioned by Detective Thomas Augustine.

What happened next is a matter of heated dispute. According to Ms. Hill, Detective Augustine handcuffed her to a chair, verbally abused her with racist and sexist invective, and

threatened to take her children away if she did not confess to the killing.  According to Detective Augustine, he questioned Ms. Hill appropriately and was at all times accompanied by Detective Anthony Tomaino.  Augustine and Tomaino testified that after just less than four hours of interrogation, Ms. Hill voluntarily admitted that she killed Nairobi DuPont and witnessed the killing of Nghia Quy Lu.  Allegedly under threat, Ms. Hill signed a typed statement reflecting these admissions.  Shortly thereafter, she was charged with the Dupont murder.

Four days later, police transported Ms. Hill from the county prison back to the homicide division, where she was questioned further by Detective Eugene Wyatt about the Lu killing.  Ms. Hill states that she provided information about two other potential suspects, but that she never confessed to the murder.  She then signed a statement that she believed reflected "what I had told them I know [about the other suspects]."  NT 03/31/92 at 76.  She did not read the statement or have the statement read to her.  The statement was a confession to the murder, and Ms. Hill was charged with the murder of Nghia Quy Lu.

Because the two murders were so similarly executed, the trial court consolidated the cases into a single trial.  At trial, the Commonwealth introduced Ms. Hill's confessions, testimony that she had fenced stolen goods that had belonged to the victims, and testimony from Detective Augustine that he found an identification card belonging to Ms. Hill at the scene of the Dupont murder.  Though Augustine testified to the existence of this card, the police failed to produce it or any property receipt referencing it.  They stated that the card had been lost; consequently, neither Ms. Hill, the judge, nor the jury ever examined it.  No fingerprints, fibers, or strands of hair were recovered linking Ms. Hill to the crimes.  Moreover, though the Commonwealth alleged that Ms. Hill killed both victims after engaging in sex with them, no DNA evidence was presented against her.

At trial, Ms. Hill's attorney emphasized the Commonwealth's threadbare presentation of evidence, but his presentation was equally sparse. Despite being appointed to represent a capital defendant, counsel did not conduct even a rudimentary investigation into Ms. Hill's mental health or into the detectives who allegedly abused her.

Though he possessed medical records showing that Ms. Hill suffered from serious mental and psychological problems, counsel did not interview the family members living with her about her mental health and intellectual limitations, and he did not have her evaluated by any type of mental health professional. Moreover, though Ms. Hill consistently insisted that Detective Augustine threatened and mistreated her during her interrogation, her attorney took no steps to investigate whether Augustine had threatened or mistreated suspects or witnesses before.

Without any information about Ms. Hill's mental health or Detective Augustine's purported practices, Ms. Hill's lawyer called her to the witness stand. She testified about Augustine's abusive comments, though she admitted that she answered his profane shouting with profane shouting of her own: "I gave what he dished out." NT 03/31/92 at 119. She also testified (on cross-examination) about her previous prison sentences, her unemployment, her abuse of alcohol and crack cocaine while pregnant, and her receipt and misuse of welfare and social security benefits. Counsel did not object to these areas of inquiry. Moreover, he did not introduce any evidence to buttress Ms. Hill's testimony that she was innocent and that her confessions were false. On Monday, April 6, 1992, Ms. Hill was found guilty of robbery and double murder. She was sentenced to death.[1]

---

[1] In 2005, during state post-conviction proceedings, the Commonwealth and Ms. Hill's attorneys stipulated that she should be resentenced to life without the possibility of parole. Such sentence was imposed in 2012.

## II.      Procedural History[2]

On September 29, 1995, the Supreme Court of Pennsylvania denied Petitioner's direct appeal and affirmed her convictions and sentence.  Petitioner, aided by counsel, filed a timely petition pursuant to Pennsylvania's Post-Conviction Relief Act (PCRA) on April 17, 1997 that raised both guilt-phase and penalty-phase claims for relief.  On December 5, 2005, the PCRA court granted Petitioner penalty-phase relief and ordered an evidentiary hearing on her *Brady* and *Batson* guilt-phase claims.  Following the evidentiary hearing, the PCRA court denied all of Petitioner's guilt-phase claims.  It reiterated its grant of penalty-phase relief.

On September 6, 2006, Petitioner filed a notice of appeal with the Pennsylvania Supreme Court from the PCRA court's denial of guilt-phase relief.  Petitioner also filed a "Jurisdictional Statement for Petitioner's Appeal of the Denial of a New Trial" setting forth fifteen appellate guilt-phase claims.  On February 9, 2007, the PCRA court issued an order under Pennsylvania Rule of Appellate Procedure 1925(b) directing Petitioner to file and serve a statement of the matters she intended to raise on appeal within fourteen days.[3]  Petitioner subsequently requested, and was granted, an extension of time to file her Rule 1925(b) statement.

---

[2] The original state court record is not available for review.  The office of the Philadelphia Clerk of Court reported in April 2013 that the physical file had been lost, *see* R&R at 1, n.1, and the best efforts of the federal court's case processing supervisor since then have yielded no results.  I have thus based my facts and procedural history on Petitioner's habeas petition and its exhibits (ECF Nos. 6 and 10), the Commonwealth's response and its exhibits (ECF No. 19), and some limited trial transcripts provided to Magistrate Judge Sitarski (see ECF No. 31).

[3] At all times relevant to Ms. Hill's case, Rule 1925(b) stated:  "**Direction to file statement of matters complained of.**  The lower court forthwith may enter an order directing the appellant to file of record in the lower court and serve on the trial judge a concise statement of the matters complained of on the appeal no later than 14 days after entry of such order.  A failure to comply with such direction may be considered by the appellate court as a waiver of all objections to the order, ruling or other matter complained of."

Petitioner did not file a Rule 1925(b) statement.  Petitioner's counsel has represented as an officer of the court that after being granted an extension of time to file the statement, he received a call from PCRA Judge Berry's chambers.  Counsel was instructed during this call to file a "list of issues" in addition to the jurisdictional statement "*rather than a 1925(b) statement*."  Obj. to R&R at 3 (emphasis added).  Counsel submitted a "list of issues" to chambers and to the Commonwealth, and a second call from chambers confirmed its receipt.[4]  Judge Berry issued an opinion addressing the merits of Petitioner's claims and denying guilt-phase relief on September 6, 2007.  The opinion stated that no 1925(b) statement was filed, but referenced Petitioner's Jurisdictional Statement and did not suggest that Petitioner had waived her claims.

On appeal, the Pennsylvania Supreme Court held that Petitioner had waived all her claims by failing to file a formal 1925(b) statement.  In reaching its decision, the state Supreme Court relied on its "bright line rule" that failure to comply with Rule 1925(b) results in automatic waiver of issues on appeal.  Petitioner now seeks federal review of her appellate PCRA claims.

## III.      The merits of this case are properly before this court.

Petitioner sets forth twelve claims in her habeas petition.  Of these claims, only one was presented to the state supreme court on direct appeal.  The other eleven were presented to the PCRA court but found waived by the Pennsylvania Supreme Court under Rule 1925(b).  If I were to find that the state supreme court's waiver finding was an independent and adequate state ground barring federal review, then I would need to consider only whether there is cause and prejudice to excuse the default and whether refusal to address the claims would result in a

---

[4] The "list of issues" that counsel filed, *see* Pet's Exh. 7 (ECF No. 10 at 62-64), states clearly and concisely each ground upon which Petitioner intended to appeal.  These issues were also clearly and concisely enumerated in Petitioner's jurisdictional statement.  However, unlike an ordinary 1925(b) statement, Petitioner's "list of issues" was not captioned "concise statement of matters complained of on appeal" and did not reference Rule 1925(b).

fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722 (1991). *See* R&R at

26. Instead, for the reasons set forth below, I find that there is not an independent and adequate

state ground barring federal review. Therefore, as discussed more fully below, I must give full

*de novo* consideration to the arguments that Petitioner raised in state post-conviction

proceedings.

A.   *The Independent and Adequate State Grounds Doctrine*

A federal habeas petitioner cannot bring claims in federal court that she waived in state court

where the state court's denial of relief rests on an "independent and adequate" principle of

waiver under state law. *Nara v. Frank*, 488 F.3d 187, 199 (3d Cir. 2007); *Johnson v. Pinchak*,

392 F.3d 551, 557–59 (3d Cir. 2004). A state waiver rule is considered "independent" of federal

law when it is not "interwoven with federal law" *Coleman,* 501 U.S. at 722, 739–40, and it is

considered "adequate" to bar relief when it is "firmly established and regularly followed," *James*

*v. Kentucky*, 466 U.S. 341, 348–49 (1984), and "consistently and regularly applied," *Johnson v.*

*Mississippi*, 486 U.S. 578, 587 (1988). A rule is inadequate to bar federal review – even if

"generally sound" – when it is applied "exorbitantly," *Lee v. Kemna*, 534 U.S. 362, 376 (2002),

or undertaken with unforeseen "pointless severity," *NAACP v. Alabama ex rel. Flowers*, 377

U.S. 288, 297 (1964).

B.   *The Exorbitant Application Rule*

Where unusual circumstances cause a litigant to "substantially, but imperfectly" comply with

a generally adequate state procedural rule, the rule of exorbitant application protects her from

procedural default. *Lee*, 534 U.S. at 366. This is a case where the unforeseeable quirks of

litigation forced Petitioner to step – in good faith and for good reason, complying with a request

from the judge – just outside the lines created by state rules.  The exorbitant application rule is therefore applicable.

The test for establishing exorbitance originated in the U.S. Supreme Court case, *Lee v. Kemna*, 534 U.S. 362 (2002), and was reduced to three analytic factors by the Second Circuit in *Cotto v. Herbert*, 331 F.3d 217 (2d Cir. 2003).  Because the Third Circuit has endorsed *Cotto*, *see Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 657 (3d Cir. 2011),[5] I will evaluate exorbitance in this case using *Cotto*'s distillation of *Lee*.

In *Lee*, a criminal defendant in Missouri made an oral motion for a continuance after learning that his alibi witnesses had left the courthouse the day they were scheduled to testify.  *Id.* at 369.  The trial court judge denied the motion on the grounds that his personal commitments and trial calendar prevented him from delaying the case.  *Id.* at 370–71.  When the defendant challenged, on direct appeal, the order denying his motion for a continuance, the Missouri Court of Appeals and Missouri Supreme Court held that his challenge was defaulted because he had not complied with state rules requiring continuance motions to be made in writing, accompanied by an affidavit, and supported by a factual showing.  *Id.* at 372–73.  The district court and court of appeals held that this was an independent and adequate state-law ground barring federal habeas review.  *Id.* at 374.  The U.S. Supreme Court reversed, because waiver resulting from nonadherence to this technical requirement was an "exorbitant application" of Missouri's rule. *Id.* at 376.

In finding that Missouri's waiver rule was inadequate to bar federal habeas review, the Supreme Court relied on three facts about the trajectory of Lee's state court litigation:  (1) the trial court did not invoke the procedural requirement at trial, and Lee's perfect compliance with

---

[5] *See also Shotts v. Wetzel*, 724 F.3d 364, 371 (3d Cir. 2013).

the rule would not have altered the outcome; (2) there was no case law that directed flawless compliance with the rule in the unique circumstances of his case; and, most importantly, (3) Lee had complied with the essential requirements of the rule, which was intended to provide information to the trial court and opposing party. *Id.* at 381–85. The Second Circuit has adapted these three considerations into a flexible test for courts evaluating exorbitance. *See Cotto*, 331 F.3d 217, *as applied in Pierotti v. Walsh,* 834 F.3d 171 (2d Cir. 2016); *Fulton v. Graham*, 802 F.3d 257 (2d Cir. 2015). The test is as follows:

(1) was the alleged procedural violation actually relied on in the trial court, and would perfect compliance with the state rule have changed the trial court's decision;

(2) did state caselaw indicate that compliance with the rule was demanded in the specific circumstances presented; and

(3) did petitioner "substantially comply" with the rule given "the realities of trial," and, therefore, would demanding perfect compliance with the rule would serve a legitimate governmental interest.

*Pierotti,* 834 F.3d 177, (quoting *Cotto*, 331 F.3d at 240 (quoting *Lee*, 534 U.S. at 382)).

## C. *Exorbitance Analysis in This Case*

The *Lee*/*Cotto* factors strongly suggest that Petitioner is entitled to federal review of her claims. First, Petitioner's alleged procedural violation was not relied on in the trial court; indeed, it was undertaken at the trial court's request. Judge Berry expressly recognized Petitioner's appellate issues in his opinion; he did not suggest that Petitioner's claims were or would be waived, and he ruled on the merits of those claims. Perfect compliance with Rule 1925(b) would not have affected Judge Berry's opinion.

Second, state case law simply did not, and does not, address the situation that this case presents. While the "automatic" nature of Rule 1925(b) waiver was well-established at the time of Petitioner's PCRA proceedings, she reasonably inferred that her "list of issues" would not

9

result in such waiver given that her non-compliance was the result of a request from the judge himself.  No Pennsylvania law suggests otherwise.

Third, and most important under *Lee* and *Cotto*, Petitioner substantially complied with Rule 1925(b).  The record makes clear that Petitioner never intended to waive her PCRA appeals, and that her attorneys reasonably believed she was not at risk of waiver.  Moreover, she provided Judge Berry and the Commonwealth, just as Rule 1925(b) required her to, with a concise statement of the matters complained of on appeal.  She simply titled it "List of Appellate Issues" rather than "Statement of Appellate Issues Filed Pursuant to Pa. R. App. P. 1925(b)."

Like the rule in *Lee*, Rule 1925(b) exists to provide information to the judge and the opposing party – its purpose is "to aid trial judges in identifying and focusing upon those issues that the parties plan to raise on appeal." *Warminster Fiberglass Co. v. Upper Southampton Twp.*, 939 A.2d 441, 443 (Pa. Commw. Ct. 2007).  There is no question that Petitioner's "list of issues" (and indeed, her jurisdictional statement) accomplished this task.  Petitioner's failure here, as in *Lee*, was a purely technical matter of form, a labeling error, and it caused no prejudice to the Commonwealth or the courts.  The third *Lee* factor, which courts have found dispositive in numerous other cases, thus clearly weighs in her favor.  *See, e.g.*, *Rolan v. Coleman*, 680 F.3d 311, 318 (3d. Cir. 2012) (procedural default improper where petitioner "substantially, if imperfectly complied" with procedural rule); *Evans v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 650, 657 (3d Cir. 2011) (similar); *Wilson v. Ozmint*, 357 F.3d 461, 466 (4th Cir. 2004) (default improper where petitioner "only failed to make his claim . . . after he received what he reasonably believed to be the blessing of the South Carolina Supreme Court").

*D.  Petitioner is Entitled to Federal Habeas Review of her Waived Claims*

The independent and adequate state grounds doctrine exists to prevent petitioners from using federal habeas courts as an "end run around the limits of [U.S. Supreme Court] jurisdiction and a means to undermine the State's interest in enforcing its laws." *Coleman*, 501 U.S. at730–31. Not only has Petitioner not committed this sin, she has affirmatively acted to prevent it. Petitioner asked the PCRA court for an evidentiary hearing on the issue of whether her confessions were coerced. Her request was denied. She submitted a list of fifteen appellate PCRA issues to Judge Berry and thoroughly briefed them in the Pennsylvania Supreme Court. The Court refused to consider the claims.

Petitioner Donetta Hill has maintained for twenty-five years that she did not kill Nairobi Dupont or Nghia Quy Lu. She raised potentially successful claims of constitutional error in state court, and was denied the opportunity to substantiate those claims with testimony and evidence. She seeks that opportunity again, this time in federal court. Federal merits review – and federal evidentiary development – is necessary here because "a state court's persnickety application" of a waiver rule cut short the process due to a habeas petitioner who "substantially complied with the rule's key requirement." *Walker v. Martin*, 562 U.S. 307, 316 n.4 (2011). Petitioner's filing of a "list of issues" instead of a 1925(b) statement cannot, on these facts, preclude her from seeking federal habeas review. Any other result would be the ultimate elevation of form over substance. I will therefore address her claims on the merits below.[6]

---

[6] There is an underlying reason why federal review is necessary and appropriate in this case. One of Petitioner's potentially meritorious claims alleges that Philadelphia homicide detectives employed racist and sexist slurs and threats when they interrogated her about the murders in this case. I take judicial notice that two Pennsylvania Supreme Court Justices have admitted viewing and sharing racist and sexist pornography as they reviewed Pennsylvania Supreme Court appeals, including the period of time when Petitioner's PCRA appeal was pending. A litigant's due process rights are violated when the circumstances of a judicial decision "give rise to an

## IV.    Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court must defer to state court decisions on the merits of a federal habeas claim.  No deference is owed, however, to state procedure-based decisions like the Pennsylvania Supreme Court PCRA decision in this case.  For AEDPA deference purposes, a claim has been decided on the merits in state court only where the state courts "finally resolved the claim" and "resolved that claim on the basis of its substance, rather than on a procedural, or other, ground."  *Shotts v. Wetzel*, 724 F.3d 364, 375 (3d Cir. 2013) (quoting *Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009)).  As here, a lower PCRA court's decision on the merits is afforded no deference where a subsequent Pennsylvania court has resolved the case on procedural grounds.  *Id*; *see also Bronshtein v. Horn*, 404 F.3d 700, 710 n.4, 715 (3d Cir. 2005); *Wilson v. Beard*, 426 F.3d 653, 659 (3d Cir. 2005).

Only one of Petitioner's federal habeas claims was decided on the merits in state court:  the Pennsylvania Supreme Court ruled on one of her prosecutorial misconduct claims in its direct appeal decision.  Accordingly, as set forth below, I will afford that claim AEDPA deference and reject it as a ground for relief.  The remainder of Petitioner's claims I consider *de novo*.

---

unacceptable risk of actual bias."  *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1908 (2016).  The fact that two Pennsylvania Supreme Court justices recreationally viewed – on state computers and on state time – numerous depictions of graphic sexual violence with captions degrading African Americans and endorsing abuse of women is cause for grave concern given Petitioner's background and its potential relevance to her claims for relief.  Compounding that concern, the judge who presided over the PCRA proceedings, Willis Berry, was moonlighting as a judicial officer, and ultimately found guilty of criminal conflict of interest for using his chambers staff to operate a private real estate business from 1997 through 2007.  The principles served by independent federal review have particular resonance against this backdrop.

**V.     Merits**

Petitioner's ten claims can be organized into three types of constitutional violations:  trial court error, prosecutorial misconduct, and ineffective assistance of counsel.  Her only potentially successful claims sound in ineffective assistance and concern counsel's failure to conduct adequate pretrial investigation.  In that regard, I agree with the vast majority of the thorough and well-reasoned Report & Recommendation of the Magistrate Judge, and therefore only briefly, I address all three classes of claims below.

A.  Trial Court Error

Petitioner claims that the trial court erred by (1) admitting her confession to the Lu murder in violation of *Massiah v. United States*, 377 U.S 201 (1964), and its progeny; (2) consolidating the Dupont and Lu trials; (3) giving incorrect jury instructions; and (4) incorrectly designating a hammer as an instrument of a crime.  These claims fail.  To grant federal habeas relief based on a trial court error, I must find that the error "deprive[d] the Petitioner" of fundamental fairness in [her] criminal trial."  *Bisaccia v. Att'y Gen.,* 623 F.2d 302, 312 (3d Cir. 1980); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43 (1974).  The trial court's actions did not deprive Petitioner of fundamental fairness.

1.  *Massiah Violation*

The trial court did not violate *Massiah* or the Sixth Amendment by admitting the Lu confession.  Petitioner claims she was entitled to the presence of counsel for Detective Wyatt's interrogation of her because the interrogation occurred after she had been charged in the Dupont murder.  The Sixth Amendment right to counsel, however, is offense-specific – it applies only to those offenses with which a defendant has been formally charged.  *See Texas v. Cobb*, 532 U.S. 162, 167–68 (2001) (holding that, because the Sixth Amendment right to counsel is offense-

specific, it generally does not attach to statements regarding uncharged offenses); *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991) (holding that a defendant's statements regarding offenses for which he has not been charged are admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses).  Because Detective Wyatt asked Petitioner only about a murder with which she had not yet been charged, he did not violate the Sixth Amendment.  No trial court error occurred on that basis.

2. *Consolidation*

The trial court also did not err in consolidating the Dupont and Lu trials.  Two charges may be consolidated into a single trial where evidence of one crime would be admissible at the trial of another, and where joinder would not be unduly prejudicial to the defendant. *Commonwealth v. Newman*, 528 Pa. 393, 598 A.2d 275 (Pa. 1991); Pa. R. Crim. P. 582, 583.  In this case, evidence of Petitioner's alleged conduct in each of the two cases would have been admissible in the other case under the common law principles of evidence later incorporated into Pennsylvania Evidence Rule 404(b).[7]  The two offenses, which took place a mere four blocks and nine months apart, both involved small men who were robbed and killed after sustaining beatings to the head with the claw-end of a hammer.  The similarity between these crimes could have been used to show a "common plan or scheme" under Pennsylvania law.  *See*, *e.g.*, *Commonwealth v. Keaton*, 556 Pa. 442, 456 (Pa. 1999); *Commonwealth v. Gordon*, 543 Pa. 513, 518 (Pa. 1996); *Commonwealth v. Hughes*, 521 Pa. 423, 456 (Pa. 1989).  Because of the substantial likeness between these cases, the trial court did not err in consolidating the Dupont and Lu trials.

3. *Error in  Jury Instructions*

---

[7] At the time of trial, Pennsylvania had not yet adopted formal rules of evidence.

Petitioner asserts three deficiencies in the instructions to the jury.  None provides a basis for relief.

(A)  Reasonable Doubt

The judge instructed Petitioner's jury that reasonable doubt "would cause a reasonably careful and sensible person to refrain or hesitate from acting upon a matter of highest importance."  Petition, ECF Doc. 6, at 57.  Petitioner asserts that this formulation of reasonable doubt impermissibly required a juror's respective doubt to reach a level that would cause him or her to *refrain* — rather than merely *hesitate* — before acting.  Although this wording is less than ideal, three of my colleagues have held that it is not constitutionally deficient, and I am persuaded by their reasoning.  *See, e.g., Porter v. Horn*, 276 F. Supp. 2d 278, 337-41 (E.D. Pa. 2003); *Laird v. Horn*, 159 F. Supp. 2d 58, 90-92 (E.D. Pa. 2001); *Peterkin v. Horn*, 276 F. Supp. 2d 342 (E.D. Pa. 2001).  The inclusion of the term "refrain" in Petitioner's standard jury charge did not impermissibly lower the Commonwealth's burden of proof.

(B)  Petitioner's "Interest" in the Case

The trial judge told Petitioner's jury that it could consider her interest in the case when evaluating her testimony.  This charge was part of Pennsylvania Standard Criminal Jury Instructions at the time of trial (and remains so today).  The Standard Instructions, however, contain an additional clause stating that a jury may consider a testifying defendant's interest in the case *just as it would the interest of any other witness*.  Petitioner contends that the judge's failure to include this language undercut her credibility by singling out her interest as vital.  However, if this instruction cast any undue doubt on Petitioner's testimony, its effect was harmless.  That Petitioner had an interest in the outcome of the case was perfectly evident to the

jurors, and the instruction does not suggest that the jury do anything other than assess her motives using their common sense.  This claim does not merit relief.

(C)  Intent to Steal

Petitioner claims that the trial court failed to sufficiently explain Pennsylvania law on robbery.  Petitioner explains that, at trial, the Commonwealth presented evidence that Petitioner admitted to killing both Dupont and Lu, and that, after the killings, she decided to steal items from their homes.  She contends that if these statements were believed by the jury, it could not convict her of robbery because her intent to steal did not arise until after the killings had occurred.  Here, the trial court instructed that the jury could find Petitioner guilty of robbery if it found that she committed a theft "in the course of" causing serious bodily injury to the victims. This instruction was not a misleading statement of the law and was consistent with Pennsylvania Standard Jury Instructions, § 15.3701A (Crim. 2008).  *See, e.g., Commonwealth v. Prosdocimo*, 525 Pa. 147, 578 A.2d 1273, 1276–77 (Pa. 1990) (finding significant that the jury charge closely tracked the language of the suggested standard jury instructions).  If the judge's language constituted any degree of error, it did not rise to the level of a due process violation, and Petitioner is therefore not entitled to relief on this claim.

4.  *Improper Application of "Possession of an Instrument of a Crime"*

Petitioner claims the trial court erred in finding that a hammer was an instrument of a crime. Petitioner was charged with two counts of possessing an instrument of a crime based upon the allegation that she used a hammer to kill Lu and Dupont.  Prior to the submission of those counts to the jury, trial counsel moved for a judgment of acquittal on the ground that a claw-hammer was not an instrument of crime.  The trial court denied the motion and affirmed its denial in postsentence motions.

16

Pennsylvania law at the time of Petitioner's trial was unclear about whether a hammer could be considered an instrument of crime.  The relevant statute defined "instrument of crime" as (1) anything specially made or specially adapted for criminal use; or (2) anything commonly used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have.  18 Pa. Cons. Stat. Ann. § 907.  Though several Superior Court cases had found that similar tools were not instruments of crime, *see, e.g.*, *Commonwealth v. Eddowes*, 580 A.2d 769 (Pa. Super. Ct. 1990) (screwdriver); *Commonwealth v. Myers*, 545 A.2d 309 (Pa. Super. Ct. 1988) (scissors); *Commonwealth v. Cavanaugh*, 420 A.2d 674 (Pa. Super. Ct. 1980) (tire iron), there was also a Superior Court case, *Commonwealth v. Ngow*, holding that a baseball bat was an instrument of crime because it was commonly used for criminal purposes.  610 A.2d 1374, 1377 (Pa. Super. Ct. 1993).  Indeed, the trial court specifically relied on *Ngow* in determining that there was sufficient evidence to establish that a hammer was an instrument of crime.  (Opinion 6/2/94, 8–9, ECF No. 19-3) ("In the matter at hand, a review of the facts shows that the claw hammers criminally employed by defendant are not unlike baseball bats.")

Given the unclear state of Pennsylvania law at the time of trial, Petitioner has not demonstrated that the judge's ruling constituted error.  The trial judge's reliance on a comparison between the claw hammer and the baseball bat discussed in *Ngow* was reasonable and proper.  This claim must be denied.

B. <u>Prosecutorial Misconduct</u>

Petitioner alleges that prosecutors failed to turn over exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), failed to disclose agreements made with witnesses promising non-prosecution in exchange for testimony, and improperly cross-examined her about irrelevant topics in order to impeach her character before the jury.  While some of the conduct

described in these claims could be criticized as gamesmanship unfit for a murder prosecution, it does not give rise to a cognizable claim for habeas relief.

### 1. Brady

Petitioner claims that the prosecutors violated *Brady v. Maryland* by withholding documents from the Philadelphia Police Department's homicide files ("H-files"). The allegedly withheld documents contained statements from neighbors contradicting the Commonwealth's theory about when Mr. Dupont was killed, documents supporting Petitioner's initial statement to police that Bruce Baldwin, and not she, had committed the Lu murder, and a statement by witness Melinda Williford contradicting her later testimony about Petitioner possessing a watch taken from the scene of the crime. This clearly exculpatory evidence should have been disclosed to the defense. However, it is not material under *Brady* and thus does not entitle Petitioner to relief.

The Commonwealth presented very little extrinsic evidence linking Petitioner to the crime, and the H-file materials somewhat erode that thin body of evidence. However, the Commonwealth also presented "a prosecutor's most potent weapon" – a confession – which some scholars have deemed so prejudicial as to "'make[] the other aspects of a trial in court superfluous.'" *See* Saul M. Kassin, *The Psychology of Confession Evidence*, 52 Am. Psychol. 221 (1997), citing C.T. McCormick, *Handbook of the Law of Evidence* (2d ed. 1972). Because Petitioner's confessions powerfully suggested her guilt, the prosecutor's failure to disclose the H-Files was not a constitutional violation in this case. It is not plausible that the granular inconsistencies exposed by the H-Files would have changed the jury's decision at trial.[8] She is therefore not entitled to *Brady* relief.

---

[8] Petitioner pleads in the alternative that her attorney was ineffective for failing to find the information contained in the H-Files on his own. However, because the information in the H-Files is not material under *Brady*, it is also not prejudicial under *Strickland*. *See, e.g., Marshall*

*2.   Witness Agreements*

Petitioner claims that the Commonwealth failed to disclose evidence of alleged agreements

not to prosecute witnesses Melinda Williford and Dwayne Culler in exchange for their testimony

against her.  At trial, Williford testified that she helped Petitioner sell property (two men's gold

rings and a watch) that had been taken from the Lu home.  Culler testified that Petitioner brought

him a number of items, including a VCR and video tapes, that were later identified as having

come from the Dupont home.  Petitioner argues that the Commonwealth "presumably agreed to

forego any prosecution" in exchange for this testimony, but never provided trial counsel with

information concerning its agreements with these witnesses.  Am. Pet. at 57.  Petitioner,

however, offers no evidence to support this naked assertion.  The Commonwealth represents that

it made no agreements with Williford and Culler.  As Petitioner offers no evidence to suggest

that the Commonwealth is incorrect, she is not entitled to relief on this claim.

*3.   Cross-Examination*

At trial, the prosecution examined Petitioner at length about her prior prison sentences, her

receipt of welfare money and use of that money to pay for drugs and alcohol, and her

dependency on alcohol and cocaine during pregnancy.  Petitioner claims this prejudicial

questioning deprived her of due process.  This claim was raised in Petitioner's direct appeal

before the Pennsylvania Supreme Court.  The Court found that the prosecutor had not committed

misconduct because Petitioner's counsel opened the door to questioning about each of these

topics during direct examination.  Because this claim – unlike Petitioner's other claims – was

adjudicated on the merits in state court, I must defer to the state court decision unless it is

contrary to or involved an unreasonable application of U.S. Supreme Court precedent.

---

*v. Hendricks*, 307 F.3d 36, 52 (3d Cir. 2002) ("The standard for materiality [under *Brady*] is the
same as that iterated in *Strickland*.").  This specific ineffectiveness claim fails as a matter of law.

When analyzing a federal claim of prosecutorial misconduct, courts must consider whether a state prosecutor's comments to the jury "so infec[ted] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). To offend due process, "the prosecutorial misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'"  *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)).

The prosecutor's cross-examination of Petitioner may have been overly aggressive. Nonetheless, I cannot deem the Pennsylvania Supreme Court's resolution of this issue under *Darden* and *Bagley* as contrary to, or an unreasonable application of, those cases.  Particularly when viewed  in light of Petitioner's confessions in this case, the state court's finding that any purported overreach by the prosecution did not deny Petitioner a fair trial in this case is not contrary to or unreasonable under federal law.

C.   Ineffective Assistance of Counsel

Petitioner's final two claims assert that her trial attorney performed inadequately and thus denied her the Sixth Amendment right to effective assistance of counsel.  As to these two grounds, I am not yet prepared to deny relief.  Claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984).  *Strickland* allows relief where counsel's actions "fell below an objective standard of reasonableness" (deficiency) and where "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different" (prejudice).  *Id.* at 688, 694.  Petitioner's trial attorney performed deficiently in both his failure to investigate her social history and his failure to investigate the circumstances of her confessions.  Counsel should prepare to address, at an evidentiary hearing, whether these failures resulted in *Strickland* prejudice.

*1. Social History*

The United States Supreme Court has clearly established that effective assistance in a capital trial requires a full investigation into a client's social and familial history. *See Wiggins v. Smith*, 539 U.S. 510, 522 (2003) (*Strickland* requires that counsel "conduct a thorough investigation of the defendant's background"); *Williams v. Taylor*, 529 U.S. 362, 396 (2000) (the Sixth Amendment "obligat[es]" counsel "to conduct a thorough investigation of the defendant's background"); *see also Sears v. Upton*, 130 S.Ct. 3259, 3261 (2010) (*per curiam*) (counsel deficient for failing to discover evidence that the defendant was physically and sexually abused, learning disabled, and severely behaviorally handicapped); *Porter v. McCollum*, 130 S.Ct. 447, 453 (2009) (counsel deficient for failing to discover that the defendant was a victim of domestic violence); *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005) (overturning conviction because counsel failed to investigate, develop, and present mental health evidence supporting diminished capacity defense). According to prominent standards in effect at the time of Petitioner's trial, attorneys were expected to "explore all avenues leading to facts relevant to the merits of the case and the penalty." ABA Standards for Criminal Justice ("ABA Standards") 4-4.1 (2d ed. 1982 Supp.).

In clear contravention of prevailing professional norms at the time of trial, Petitioner's trial attorney did not conduct a social history investigation. He interviewed few witnesses about Petitioner's upbringing or family background, and he consulted no medical professionals about her mental and psychological health. This failure is no small matter, as such an inquiry would have revealed that Ms. Hill suffers from borderline intelligence and brain damage, facts of critical importance in evaluating the accuracy of a confession. *Decl. of Dr. Jethro Toomer at* 3, ECF 10-2 at 84. *See Hall v. Florida,* 134 S.Ct. 1986, 1993 (2014) (Intellectually disabled people "are more likely to give false confessions, are often poor witnesses, and are less able to give

meaningful assistance to their counsel."); *Atkins v. Virginia*, 536 U.S. 304, 320 (2002) (applying similar analysis); *United States v. Swint*, 15 F.3d 286, 289 (3d Cir. 1994) (assessments of confession voluntariness require evaluation of suspect's mental health); *United States ex rel. Daley v. Yeager*, 415 F.2d 779, 781 (3d Cir. 1969) (considering petitioner's mental illness and suggestibility in confession voluntariness inquiry); *United States ex rel. Johnson v. Yeager*, 327 F.2d 311, 316 (3d Cir. 1963) (considering defendant's "inadequate personality" and narcotics addiction).  He also failed to uncover that she was repeatedly raped by her nephew as a child and that she suffers from PTSD and bipolar disorder, *id* at 83, conditions highly relevant under the precedent set forth above.

There is no question that Petitioner's counsel performed deficiently by failing to investigate her social history.  The question remains whether his performance resulted in guilt-phase prejudice.  It is certainly conceivable that, armed with the information he should have had about his client's cognitive defects, counsel could have made a persuasive showing that her confessions should not be admitted – or that, if admitted, the jury should not take them as credible evidence. It is also plausible that he could have used information about petitioner's health to advise her not to testify, to demonstrate that she acted under an extreme emotional disturbance, or to otherwise elicit a not-guilty verdict at trial.  To this point, Petitioner has not shown a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Rompilla*, 545 U.S. at 390 (quoting *Strickland*, 466 U.S. at 695).  Petitioner will be given such opportunity at an evidentiary hearing.

2. *Circumstances of the Confessions*

In addition to investigating a client's social history, a capital defense attorney must also fully investigate the facts and circumstances of the client's alleged crime.  *Id* at 402 (effective

assistance requires "vigorous advocacy as dictated by the facts and circumstances in the particular case,"); *Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Siehl v. Grace*, 561 F.3d 189 (3d Cir. 2009) (counsel was ineffective for failing to conduct a full investigation of a murder scene.); *Hummel v. Rosemeyer*, 564 F.3d 290, 304 n.4 (3d. Cir. 2009) ("[W]hen a strategic choice is made by counsel without the full investigation warranted by the facts and circumstances, it is unreasonable."); *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006) ("Only choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity."). In the case of a confession, the duty includes an adequate investigation of the circumstances surrounding the confession. *United States v. Serrano*, 798 F. Supp. 2d 634, 642 (E.D. Pa. 2011) (Brody, J).

Trial counsel did not fulfill his constitutional responsibility. Despite Petitioner's repeated protestations – to her attorney, to the judge, and to the jury – that detectives coerced her confessions, counsel conducted no external investigation to try to prove her story true. Counsel moved to suppress Petitioner's statements based upon the detectives' alleged coercion, but he did so without making any attempt to **substantiate** this claim. Counsel's failure to investigate the detectives who allegedly mistreated his client, just like his failure to investigate his client's own social history, was deficient performance under *Strickland*. In this claim, as with Petitioner's social history claim, the question again is prejudice.

It is not clear whether competent counsel would have discovered a great deal of evidence to support allegations of coercive conduct by Detective Augustine and his colleagues. Proof of that allegation might be elusive, non-existent, or weak. However, a simple search of the Court's Electronic Filing System (ECF) and Westlaw using Detective Augustine's name shows that

23

numerous other individuals (several of them now exonerated by DNA evidence) have alleged

that Augustine coerced or manufactured their sworn statements.[9]  While these allegations cannot,

of course, substantiate Ms. Hill's claims of coercion – and though several of them occurred after

Ms. Hill's trial – they lend sufficient plausibility to Petitioner's prejudice claim that I will allow

her to present evidence on it.[10]

---

[9] Detective Augustine took the statements of Herbert Haak and Robert Wise in the infamous 1995 "center city jogger" case.  Both before and at trial, Haak testified that Augustine beat him during an interrogation and forced him to sign blank pages upon which confessions were typed later.  Haak and Wise were acquitted at trial after DNA evidence demonstrated their innocence, and they then sued Augustine under 42 U.S.C. § 1983.  The case ended in settlement.  *See* Order, *Haak v. City of Philadelphia*, No. 97-6634 (E.D. Pa. Dec. 7, 2007).

A fifteen-year-old named Bobby Harris complained at his murder trial in 1989 that Augustine used racial epithets, obscenities, and threats to coerce his confession.  Petitioner has attached an affidavit from Mr. Harris detailing his alleged abuse.  *See* Decl. of Bobby Harris, ECF Doc. 10-2 at 87.

A witness named Darryl Woods in another murder case, whose statement Augustine apparently helped procure and/or transcribe in 1989, stated that he never gave a statement to Det. Augustine or his colleagues at all and that he was told he would be locked up if he did not sign the final page of a written statement attributed to him.  *See Commonwealth v. Reid*, No. NO-8907-008-012, 1993 WL 1156018 (Pa. Com. Pl. Jan. 21, 1993).

Anthony Wright, who was exonerated by DNA evidence after spending 25 years in prison for a 1991 rape and murder he did not commit, has alleged that Augustine conspired to manufacture sworn statements and testified at trial that he recovered bloodstained clothing from Wright's bedroom when his colleagues actually recovered it from the scene of the crime.  *See* Complaint & Jury Demand, *Wright v. City of Philadelphia*, No. 16-5020 (E.D. Pa. Sept. 20, 2016).

Marvin Woods, who was convicted for a September 1991 shooting on a South Philadelphia playground, has also asserted that Det. Augustine engaged in "malicious misconducts" and "fabrication of evidence."  *See Commonwealth v. Woods*, 1367 EDA 2012 (Pa. Super. Ct. Apr. 16, 2013).

[10] The Commonwealth argues that this evidence would in any event not have been admissible at trial because it constitutes propensity evidence excludable under Pennsylvania's common law rules of evidence later codified as Rule 404(b).  *See Bacone v. Phila. Hous. Auth.*, 112 F. Appx. 127 (3d Cir. 2004).  This argument is not dispositive.  Petitioner's claim that Detective Augustine regularly elicited untrue statements from homicide suspects through demeaning and threatening invective might, if proven with sufficient specificity, constitute a "common scheme or plan" that would permit admission.  Moreover, even if the evidence were deemed inadmissible at trial, it might have influenced the judge's pretrial decision about whether to admit Petitioner's confessions at all.

Petitioner received a copy of Detective Augustine's police personnel file in PCRA proceedings. She requested an evidentiary hearing on this claim before the PCRA court and was denied.  Consequently, Petitioner has not yet had an opportunity to elicit testimony or introduce evidence about Detective Augustine's purported misconduct in this case.  For this reason, an evidentiary hearing on the claim is appropriate.

## VI.    Authority to Conduct an Evidentiary Hearing

Two sources of law limit the circumstances under which a federal habeas court can hold an evidentiary hearing.  This is the comparatively rare case where neither rule applies.

28 U.S.C. § 2254(d) has been construed by the Supreme Court as limiting the scope of federal review to the record created in state court.  Under *Cullen v. Pinholster*, 563 U.S. 170 (2011), a federal court is required to evaluate habeas claims using only the state court record. But § 2254(d) on its face applies only to claims "adjudicated on the merits."  Because the Pennsylvania Supreme Court decided Ms. Hill's PCRA appeal on procedural rather than substantive grounds, the principles set forth in *Pinholster* do not apply.

In addition, 28 U.S.C. § 2254(e)(2) explicitly limits a federal court's power to receive evidence in a habeas proceeding as to any claim where "the applicant has failed to develop the factual basis of [that] claim in State court proceedings."  This limitation is likewise inapplicable, because Ms. Hill diligently attempted to develop her current claims in state court.  Ms. Hill requested a hearing on these claims in PCRA court, but her request was denied.  In her List of Appellate Issues to the Pennsylvania Supreme Court, she alleged that the PCRA court erred in denying her request for a hearing.  This allegation of error was never considered on the merits. Ms. Hill may present evidence here because she litigated her claims below as fully as the state courts would allow.

If neither *Pinholster* nor § 2254(e)(2) applies, then a district court may hold a hearing whenever such hearing would "have the potential to advance the petitioner's claim."  *Campbell v. Vaughn*, 209 F.3d 280, 287 (3d. Cir 2000)).[11]  For the reasons stated above, I find that such a hearing will aid in my resolution of this case.

## <u>CONCLUSION</u>

Petitioner is an admitted thief, addict, and prostitute.  She has, however, persistently denied that she is also a murderer.  The merits of her claim were never properly reached by the state court, and there is sufficient cause for concern that she should at least be given the opportunity to be heard as to whether legal prejudice stemmed from the failings of her trial attorney.


_____/s/ Gerald Austin McHugh_
United States District Judge

---

[11] *See also Buda v. Stickman*, 149 F. App'x 86, 90 (3d Cir. 2005)